IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 3, 2019

## STATE OF TENNESSEE v. STEVIE WILLIAMSON

**Appeal from the Criminal Court for Shelby County**
**No. 16-02261      Lee V. Coffee, Judge**

_____

### No. W2019-00437-CCA-R3-CD

_____

The Defendant, Stevie Williamson, was convicted by a Shelby County Criminal Court jury of attempt to commit second degree murder, a Class B felony; employing a firearm during the commission of a dangerous felony, a Class C felony; unlawful possession of a handgun by a convicted felon, a Class C felony; and reckless endangerment, a Class E felony. *See* T.C.A. §§ 39-12-101 (2018) (criminal attempt), 39-13-210 (2018) (second degree murder), 39-17-1324 (2018) (employment of a firearm), 39-17-1307 (2018) (firearm possession by a convicted felon), 39-13-103 (2018) (reckless endangerment). The trial court sentenced the Defendant to consecutive terms of twenty years for attempted second degree murder, fifteen years and twelve years for the firearm convictions, and six years for reckless endangerment, for an effective fifty-three-year sentence. On appeal, the Defendant contends that the trial court erred (1) by admitting evidence of the Defendant's previous convictions and (2) by imposing consecutive service of the sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Harry E. Sayle III (on appeal), Memphis, Tennessee; Phyllis L. Aluko, District Public Defender; and James Coleman (at trial) and John Schott (at trial), Assistant District Public Defenders, for the appellant, Stevie Williamson.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistance Attorney General; Amy P. Weirich, District Attorney General; Kevin McAlpin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to the October 17, 2015 shooting of Alexander Thompson. At the trial, Memphis Police Officer Alexander Fleites testified that he responded to a shooting call and that he saw a man, who had suffered a gunshot wound, lying in front of a home on the street or sidewalk area. Officer Fleites secured the scene and conducted a preliminary investigation. He stated that the Defendant was not at the scene, that witnesses identified the Defendant as the shooter, and that a "broadcast was put out."

Memphis Police Crime Scene Officer David Smith testified that he responded to the scene but that no evidence was collected. The victim had already been transported to the hospital when Officer Smith arrived, and Officer Smith did not see any cartridge casings, bullets, and blood spatter. He took photographs of the scene, which were received as exhibits.

Alexander Thompson testified that the shooting occurred outside his aunt's home and that he had been at the home with his aunt's boyfriend, Shed Houston; his nephew, Carey Webb; and several cousins. Mr. Thompson recalled that Marvin Grant, a cousin, worked on a bicycle while Mr. Thompson worked on a car that was parked in the yard. Mr. Thompson said that he had been working about thirty minutes when the shooting occurred. Mr. Thompson said that the Defendant dropped off Mr. Houston's niece, April Boyce,[1] and recalled that the Defendant and Ms. Boyce argued and that the Defendant threw Ms. Boyce's clothes out of the Defendant's truck. Mr. Thompson said that Ms. Boyce walked up the driveway and entered the home and that the Defendant left. Mr. Thompson said that the Defendant returned, that he parked his truck on the opposite side of the street "by the park," that he cursed, and that he left again. Mr. Thompson said that Ms. Boyce had been outside when the Defendant returned.

Mr. Thompson testified that the Defendant returned a third time, that the Defendant walked up the driveway, and that Ms. Boyce ran inside the home when she saw the Defendant. Mr. Thompson said that he was outside when the Defendant walked up the driveway and that Mr. Houston, Mr. Webb, Mr. Grant, and several cousins were outside, as well. Mr. Thompson said that Mr. Webb sat on a bench and could not see the Defendant walking up the driveway, that the Defendant walked up to Mr. Webb, and that the Defendant began beating Mr. Webb on the head. Mr. Thompson said he intervened, striking the Defendant once, and told the Defendant, "Look, man. We don't do that . . . kind of stuff here." Mr. Thompson said that he grabbed the Defendant's arm, "walked him down the driveway," let go of him, and told him to leave. Mr. Thompson said that

---

[1] The witness is referred to as April Boyce and April Boyd throughout the transcript. We use April Boyce for consistency.

the Defendant walked toward his truck but turned around and that the Defendant had a handgun. Mr. Thompson said that he placed his hands in the air and asked the Defendant if he were going to shoot him because of "some stuff just like this right here," that the Defendant shot him in the chest, and that the Defendant entered his truck and drove away. Mr. Thompson denied attempting to hurt the Defendant and said he just wanted to defuse the situation and to make the Defendant leave. Mr. Thompson denied having a gun.

Mr. Thompson testified that although he knew the Defendant before the shooting, they were not friends. Mr. Thompson crawled from the driveway to the street, lost consciousness, and awoke to his aunt's shaking him. The bullet that struck Mr. Thompson "destroyed" a vertebra and had not been removed at the time of the trial. Mr. Thompson was permanently paralyzed, and he said he "died twice" during his two-month hospitalization.

On cross-examination, Mr. Thompson testified that he did not drink alcohol or use controlled substances. He said that the Defendant returned about five minutes after dropping off Ms. Boyce and cursed at her and that Mr. Webb was not at the home at this time. Mr. Thompson said that Ms. Boyce went inside the home in response to the Defendant's cursing and that the Defendant drove away but returned about ten minutes later, during which time Mr. Webb had arrived at the home. Mr. Thompson said that the Defendant did not speak to anyone before repeatedly striking Mr. Webb.

Mr. Thompson testified that the Defendant did not retrieve the handgun from the truck and that the Defendant had the gun when the Defendant arrived the third time. After the shooting, Mr. Thompson saw the Defendant drive away before losing consciousness.

Marvin Grant testified that he and Mr. Thompson were cousins, that Ms. Boyce was his niece, and that Mr. Houston was his brother-in-law. Mr. Grant said that on the day of the shooting, he was at Mr. Houston's home working on his bicycle and cleaning scrap metal and that Mr. Thompson was working on a car. Mr. Grant provided testimony consistent with Mr. Thompson's testimony regarding Ms. Boyce's arrival at the home, the Defendant's and Ms. Boyce's arguing, the Defendant's leaving and returning to the home, and the Defendant's cursing at Ms. Boyce before leaving again. Mr. Grant said that Mr. Webb arrived at the home, that the Defendant returned for a third time, and that the Defendant yelled at Mr. Webb to "get out from beside my woman." Mr. Grant recalled Mr. Webb sat beside Ms. Boyce.

Mr. Grant testified that when the Defendant returned the third time, the Defendant approached Mr. Webb and stated, "Didn't I tell you to get away from beside my effing woman," before striking Mr. Webb three times. Mr. Grant said that Mr. Thompson

-3-

intervened but that Mr. Grant feared what the Defendant might do if the Defendant were able to enter the truck. Mr. Grant recalled that the Defendant said he was going to "blow [Mr. Webb's] head off" and that Mr. Grant knew a gun was inside the Defendant's truck. Mr. Grant said that he had seen the gun two days before the shooting. Mr. Grant provided testimony consistent with Mr. Thompson's testimony regarding Mr. Thompson's intervening, striking the Defendant once, and walking the Defendant down the driveway and regarding the Defendant's shooting Mr. Thompson and driving away. Mr. Grant recalled that the children were in the yard when the shooting occurred and that children from the park across the street walked to the home to find out what had occurred.

On cross-examination, Mr. Grant testified that although he thought the Defendant's gun was inside the truck, the Defendant already had the gun. Mr. Grant said that his relationship with the Defendant before the shooting had been "perfect."

Carey Webb testified that Mr. Thompson was his uncle, that Ms. Boyce and Mr. Grant were his cousins, and that the Defendant was his friend. Mr. Webb provided testimony consistent with that of Mr. Thompson and Mr. Grant regarding the events leading up to the assault against Mr. Webb. Mr. Webb stated that when the Defendant arrived for the last time, the Defendant said, "[W]hy you standing around my woman?" Mr. Webb said that the Defendant struck his head, causing him to "blink[] out for a little while," and that when he awoke, he saw Mr. Thompson "holding [the Defendant] down the hill." Mr. Webb said that he saw Mr. Thompson hold up his hands and heard a gunshot but that he did not see who held the gun.

On cross-examination, Mr. Webb testified that Ms. Boyce reported the Defendant had a gun but that Mr. Webb "didn't think nothing of it." Mr. Webb said that after Mr. Thompson escorted the Defendant to the end of the driveway, the Defendant ran toward the truck and then "came back" and that Mr. Webb heard a gunshot and saw Mr. Thompson lying on the ground. Mr. Webb thought the Defendant retrieved something from the truck but said he did not get up from where he sat until he heard the gunshot. He said that before the shooting, the Defendant confronted him about an incident involving Ms. Boyce's burning the Defendant's clothes. Mr. Webb denied having any knowledge of the incident and having threatened the Defendant.

Memphis Police Detective Miranda Jones interviewed the Defendant, who admitted that he was responsible for the "aggravated assault" because Mr. Webb had threatened to rape the Defendant on a previous day. The Defendant told Detective Jones that when he saw Mr. Webb at the home, he hit Mr. Webb on the jaw, that a man walked toward him and "swung on [him]," that he "upped" his handgun, and that he shot the man once. The Defendant stated that after the shooting, he left the scene and threw away the handgun, which he bought "off the street." The Defendant stated that although he was

armed when he left his truck, he did not intend to shoot anyone until the man punched him. The Defendant denied having any previous altercations with the man and stated, "It was a mistake. I wasn't trying to really shoot him."

The Defendant elected not to present evidence.

Upon this evidence, the jury found the Defendant guilty of attempt to commit second degree murder, employing a firearm during the commission of a dangerous felony, and reckless endangerment. The Defendant was also convicted of possession of a firearm while being a convicted felon. This appeal followed.

## I.      Defendant's Previous Convictions

The Defendant contends that the trial court erred by determining that if the Defendant elected to testify, the State would be permitted to question him for impeachment purposes about his previous convictions for voluntary manslaughter and aggravated assault. He argues that admission of the previous convictions violated Tennessee Rule of Evidence 609 because the unfair prejudicial effect of the convictions on the substantive issues outweighed the probative value of his credibility. The State responds that the trial court did not abuse its discretion.

In a jury out hearing, the trial court determined that the voluntary manslaughter and aggravated assault convictions occurred on August 3, 2004. The court noted the ten-year limitation period for utilizing convictions for impeachment purposes pursuant to Rule 609 but determined that the Defendant had displayed a "continuous pattern of criminal conduct" and that the probative value of the convictions was not substantially outweighed by the danger of unfair prejudice to the Defendant. The court determined that although the offenses of aggravated assault and voluntary manslaughter were crimes of violence and similar to the charged offenses in the present case, the probative value of the convictions on the issue of credibility outweighed the unfair prejudicial effect on the substantive issues. The court found that

> If [the Defendant] takes the stand, and the issue becomes credibility as to what he did or what he didn't do, or what other people may have done, or why he did what he did, according to his statement, because somebody had wanted him to engage in homosexual acts, and that's why he approached Mr. Webb and shot the other person, because the other person struck him, or was threatening to strike him.
>
> If the issue is, in fact, credibility, this Court will find, as mandated by [*State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999),] and other cases, . . . the probative value on the issue of credibility would, in fact, far outweigh any

possible prejudice that could come with a jury being informed that [the Defendant], in fact, does have those felony convictions.

And the Court, if [the Defendant] decides to testify, will give the jury a limiting instruction indicating that, if they find [the Defendant] had other convictions, other than those for which he is on trial, that they can use that conviction only for the purposes of its effect, if any, on his credibility as a witness.

But, if he . . . takes the stand and testifies, if he puts his credibility at issue -- and I don't know how he cannot put his credibility at issue when he takes that stand and testifies -- those other convictions will, in fact, become admissible for impeachment purposes on the . . . substantive issue[] of credibility.

Trial counsel argued that voluntary manslaughter was a crime of passion and did not involve a crime of dishonesty or false statement and that the conviction should not be used for impeachment purposes. Counsel argued that the probative value of the conviction was not substantially outweighed by the danger of unfair prejudice. The trial court stated that although crimes of violence generally had little bearing on honesty, the "potential prejudice is heavily outweighed by the probative value of the prior convictions on the issue of credibility only."

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *Franklin*, 308 S.W.3d at 809 (citing *Lewis*, 235 S.W.3d at 141).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 609 permits the use of previous convictions to impeach a witness's credibility so long as the crime was punishable by death or imprisonment of more than one year or the crime involved dishonesty or false statements.

Tenn. R. Evid. 609(a)(2). Impeachment evidence admitted pursuant to Rule 609(a) "is limited to the fact of a former conviction and that the crime was committed." *State v. Taylor*, 993 S.W.2d 33, 35 (Tenn. 1999). Previous convictions cannot be admitted as evidence to show a defendant's propensity to commit the charged offense, regardless of whether witness credibility is a central issue at a trial. *See* Tenn. R. Evid. 404(b). In determining the admissibility of a defendant's previous conviction pursuant to Rule 609, a trial court must make findings relative to whether the conviction's probative value on the Defendant's credibility outweighs the unfair prejudicial effect on the substantive issues raised during the trial. *State v. Thompson*, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000); *see Mixon*, 983 S.W.2d at 674. Therefore, a trial court "must analyze the relevance the impeaching conviction has to the issue of credibility," "explain [the relevance] on the record," and "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id.* (internal quotation marks and citations omitted); *see State v. Waller*, 118 S.W.3d 368 (Tenn. 2003); Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.09[10][c] (6th ed. 2011). "If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination." Tenn. R. Evid. 609(a)(3).

Relative to credibility, violent crimes "might reflect on the moral character of a witness and therefore are not without probative value on credibility." Cohen, § 6.09[10][c]; *see State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (stating "felonies of a violent nature reflect on the moral character of a witness . . . [, and] this evidence is not usually without probative value"). However, "the link between [violent] crime and truthfulness is, at best, weak and the potential prejudice is significant." Cohen, § 6.09[10][c]; *see State v. Barnard*, 899 S.W.2d 617, 621-23 (Tenn. Crim. App. 1994); *Long v. State*, 607 S.W.2d 482, 485-86 (Tenn. Crim. App. 1980) (stating crimes involving assaultive conduct might result from causes that have "little or no direct bearing on honesty or veracity").

The impeaching convictions of voluntary manslaughter and aggravated assault and the offenses for which the Defendant was on trial in the present case were crimes involving violence. Although voluntary manslaughter and aggravated assault might be relevant to the Defendant's moral character and are not without minimal probative value on his credibility, the connection between violent offenses and truthfulness is weak and the potential prejudice created by the admission of the previous convictions is significant. *See* Cohen § 6.09[10][c].

In determining that the Defendant's previous voluntary manslaughter and aggravated assault convictions were admissible for impeachment purposes, the trial court was required to determine and explain the relevance of the convictions to the issue of credibility and to assess the similarity between the present offenses and the impeaching

convictions. *See Thompson*, 36 S.W.3d at 109. The court acknowledged the similarity between the present offenses and the impeaching convictions due to all being violent offenses but nonetheless determined that the probative value of the impeaching convictions regarding the Defendant's credibility outweighed the unfair prejudicial effect on the substantive issues in the case. However, the court failed to explain this determination and merely determined that if the Defendant chose to testify, the Defendant placed his credibility in issue relative to the events that led to the shooting. The Defendant was on trial for attempting to kill another person, and his previous convictions involved assaulting and causing the death of another person. Although these impeaching convictions could have held nominal probative value relative to the Defendant's character and to the jury's ability to determine what occurred on the day of the shooting, the relevance of the convictions to the Defendant's credibility is not apparent from the record. The fact that the impeaching convictions involve criminal conduct is insufficient to establish admissibility pursuant to Rule 609. *See Mixon*, 983 S.W.2d at 674; *State v. Garry Baker*, No. M2016-01164-CCA-R3-CD, 2017 WL 1534993, at *5-10 (Tenn. Crim. App. April 28, 2017). As our supreme court had stated, "When an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt." *Mixon*, 983 S.W.2d at 674. As a result, we conclude that the trial court abused its discretion by allowing the State to impeach the Defendant with the previous convictions if he chose to testify. The previous convictions, at most, merely had minimal probative value in assessing the Defendant's moral character and credibility, which was outweighed by the high prejudicial effect.

However, multiple witnesses provided consistent testimony regarding the Defendant's conduct before, during, and after the shooting, and the evidence of the Defendant's guilt was overwhelming. Therefore, we conclude that the error in this case was harmless and that the Defendant is not entitled to relief on this basis.

## II.    Sentencing

The Defendant contends that the trial court erred by imposing consecutive service. He argues that the record does not support the court's determination that he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The State responds that the trial court did not abuse its discretion.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the forty-six-year old Defendant had previous convictions for voluntary manslaughter, felony theft, eight counts of driving while his license was

suspended, "attempt to commit a felony," assault, vandalism, misdemeanor theft, and an undefined offense.[2] Likewise, the Defendant had previous juvenile adjudications for burglary in the third degree, receiving and concealing stolen property, assault and battery, robbery, petit larceny, disturbing the peace, carrying a dangerous weapon, malicious mischief, trespassing on school property, and a curfew violation.

The report reflects that the Defendant completed the seventh grade and reported leaving school for disciplinary reasons related to fighting. The Defendant expressed during the presentence interview that he wanted to continue his education. The Defendant reported fair mental health with treatment for attention deficit hyperactivity disorder (ADHD) and good physical health, although he was being treated for high blood pressure and diabetes. The Defendant denied using illegal narcotics but said he drank alcohol twice per week until his arrest. The Defendant reported receiving mental health treatment twice as a teenager for ADHD and having a good relationship with his family. The Defendant reported previous employment and stated he had also performed "odd jobs" for eighteen years.

The Defendant testified that he grew up living with his mother and brother. He said that he completed the seventh grade, that he dropped out of school because of fighting, and that he had been employed. He said that he had been diagnosed with ADHD, that he obtained treatment for his mental "disability," and that he worked with a caseworker, who ensured he took his medication. He said that it was difficult for him to remember things.

The Defendant testified that on the day of the shooting, he and his girlfriend fought and that Mr. Thompson "came out of nowhere and struck" him. He said that Mr. Thompson attempted to prevent him from getting into his truck, that he feared for his life, and that he fired one shot toward Mr. Thompson. The Defendant said that he did not intend to shoot or to kill Mr. Thompson and that it was a "mistake." The Defendant said that he had known Mr. Thompson for a couple of months at the time of the shooting and that he had assisted Mr. Thompson in hauling away "scrap band."

The Defendant testified that he had thought about the shooting, that he wanted to apologize to Mr. Thompson, and that he sought mercy from the trial court. He said he was sorry "for what happened" and that the shooting was a mistake. He said that he turned himself in to the police after speaking with his brother, who worked at the Memphis Police Department.

---

[2] We note that although the presentence report does not reflect that the Defendant had a previous conviction for aggravated assault, which was a conviction at issue for impeachment purposes, the record reflects that the voluntary manslaughter and aggravated assault convictions stemmed from the same indictment. The Defendant does not dispute having a previous conviction for aggravated assault.

On cross-examination, the Defendant testified that he was claiming he acted in self-defense, although he went to someone else's home looking for a fight with Mr. Webb. The Defendant later denied knowing he was going to fight Mr. Webb. The Defendant said he went to the home to drink alcohol. He agreed Mr. Thompson struck him once in an effort to stop the fight but said Mr. Thompson prevented him from getting inside his truck. The Defendant thought his shooting Mr. Thompson was a reasonable response to being struck once by Mr. Thompson.

The Defendant acknowledged that he had previous convictions for voluntary manslaughter, aggravated assault, criminal attempt to commit a felony, which he testified was related to a "break in" at a school, and two counts of felony theft. When asked why he and Mr. Webb fought, the Defendant said "probably because Mr. Webb said he was going to take my vehicle." The Defendant said he had a handgun for protection, although he knew he could not possess a handgun lawfully.

Upon examination by the trial court, the Defendant testified that when he was convicted of his previous felonies, the trial judge told him that he could not possess a handgun. The Defendant agreed that he had the handgun for protection and that he placed the handgun inside his truck.

The trial court considered the evidence presented at the trial and at the sentencing hearing, the arguments of counsel, the Defendant's testimony and his potential for rehabilitation, the nature and characteristics of the criminal conduct, the applicable mitigating and enhancement factors, and the statistical data provided by the Administrative Office of the Courts. The court determined that the Defendant had five previous felony convictions and that, as a result, the Defendant was a Range II, multiple offender for the attempt to commit second degree murder conviction and was a Range III, persistent offender for the remaining convictions. The court noted that in addition to the felony convictions, the Defendant had been convicted of assault, vandalism, three counts of driving while his license had been suspended, and an unidentified offense. The court found that the Defendant had juvenile delinquency adjudications for burglary in the third degree and concealing stolen property and that each offense would have been a felony if the Defendant had been an adult. The court noted additional adjudications for assault and battery, petty larceny, disturbing the peace, carrying a dangerous weapon, malicious mischief, and trespassing. The court determined that the Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range.

The trial court, likewise, applied enhancement factors (1), (6), (9), (11), and (16). *See* T.C.A. § 40-35-114(1) (2018). The trial court determined that the Defendant "invaded" another person's property and engaged in belligerent, hostile activities without provocation. The court found that no grounds existed to excuse the Defendant's conduct.

-10-

The court found the Defendant's claim that he was threatened by Mr. Thompson's stopping a fight and punching the Defendant once was "insane" and "illogical." The court stated that "you cannot bring a gun to a fistfight when you initiated the fistfight." The court determined that the Defendant did not have a right to be at the home engaging in unlawful conduct. The court determined that the Defendant had a sustained intent to violate the law based upon his previous convictions "spanning his entire adult life." The court noted that the Defendant's criminal conduct began at age thirteen and continued for thirty-three years. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]").

The trial court determined that the personal injuries inflicted upon Mr. Thompson were particularly great. *See id.* § 40-35-114(6) (2108). The court stated that Mr. Thompson had been an "able-bodied" person before the shooting and had merely attempted to end an argument. The court found that Mr. Thompson had an extended hospitalization and had been permanently paralyzed and confined to a wheelchair as a result of his injuries. The court found that Mr. Thompson raised his hands when the Defendant pulled out the handgun and that Mr. Thompson did not pose a threat to the Defendant. The court also determined that the Defendant employed a firearm during the commission of the attempted second degree murder, and it placed significant weight on this factor. *See id.* § 40-35-114(9). The court applied factor (11) because the Defendant's conduct resulted in serious bodily injury to Mr. Thompson and threatened serious bodily injury to others and because the Defendant had been convicted previously of a felony that resulted in the death of another person. *See id.* § 40-35-114(11) ("The felony resulted in . . . serious bodily injury, or involved the threat of serious bodily injury, to another person, and the defendant had previously been convicted of a felony that resulted in death or serious bodily injury[.]"). The court placed "extreme weight" on this factor. The court, likewise, placed "great" weight on the Defendant's juvenile adjudications that would have been felony offenses if the Defendant had been an adult. *See id.* § 40-35-114(16) ("The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult[.]").

The trial court sentenced the Defendant as a Range II, multiple offender to twenty years for attempted second degree murder. The court imposed Range III, persistent offender sentences of twelve years for being a convicted felon in possession of a firearm and fifteen years for employing a firearm during the commission of a dangerous felony. The court also imposed a six-year sentence for reckless endangerment.

The trial court considered the State's request to impose consecutive service on the basis that the Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of income. *See id.* § 40-35-115(b)(1) (2018). The court found that the Defendant testified he had "never really worked" and that the

Defendant's criminal history was extensive. The court stated that it was difficult to understand how the forty-six-year-old Defendant had supported himself without ever having had a job but that insufficient evidence existed to support consecutive service on this basis. *See id.*

The trial court, though, determined that consecutive service was warranted based upon the Defendant's extensive criminal history that spanned approximately thirty-three years. *See id.* § 40-35-115(b)(2). The court found that the Defendant had multiple felony and misdemeanor convictions and had numerous juvenile delinquency adjudications.

The trial court, likewise, determined that the Defendant was a dangerous offender who had little hesitation about committing the present offenses in which the risk to human lift was high. *See id.* § 40-35-115(b)(4). The court found that the circumstances surrounding the offenses were "aggravated." The court noted that the offenses began with an argument between the Defendant and his then-girlfriend, escalated into an assault resulting in the Defendant's being punched and escorted to his truck, and ended with the Defendant's shooting Mr. Thompson in the presence of other people, including young children. The court found that the shooting occurred in a residential neighborhood during daylight hours.

The trial court, likewise, determined that an extended period of confinement was necessary to avoid depreciating the seriousness of the offenses and to prevent the Defendant's criminal conduct from continuing. The court found that the Defendant's thirty-three-year criminal history established that the Defendant was unwilling to lead a productive life. The court found that consecutive service was also warranted based upon the "severity of the offense[s]" and the Defendant's "background, when he had killed one person, been convicted of an aggravated assault of another person, and almost killed . . . another person." The court stated that the community needed to be protected from the Defendant's further criminal conduct. The court imposed consecutive service of each sentence, for an effective fifty-three-year sentence in confinement.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727

S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

In order to impose consecutive sentences on the basis that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," a trial court must also find that the sentences "are reasonably related to the severity of the offenses" and "are necessary in order to protect the public from further criminal acts" by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); s*ee State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996).

The record reflects that the trial court determined that the circumstances surrounding the offenses were "aggravated," noting that the offenses began as a domestic dispute, escalated into an assault, and ended with the Defendant's shooting Mr. Thompson for attempting to intervene in the Defendant's assault against Mr. Webb. The incident occurred in the presence of children. The court found that consecutive service was related to the "severity of the offenses." Likewise, the court determined that extended confinement was necessary to prevent the Defendant's criminal conduct from continuing based upon the Defendant's thirty-three-year criminal history, which showed that the Defendant was unwilling to lead a productive life. The court noted that the Defendant had been previously convicted of voluntary manslaughter and determined that

the community needed to be protected from the Defendant's further criminal conduct. We conclude that the trial court's determinations are supported by the record and that the court did not abuse its discretion by imposing consecutive service on the basis that the Defendant is a dangerous offender. The Defendant is not entitled to relief on this basis.

Although the Defendant has not challenged the trial court's imposition of consecutive service on the basis that the Defendant is an offender whose record of criminal activity is extensive, the record supports the court's determination in this regard, as well.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE